UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

DREW DAVID KIRKMAN,        )
                                  )
        Petitioner,         )
                                  )
v.                              )         No.: 1:13-CV-28-HSM-SKL
                                  )
GERALD MCALLISTER, Warden,   )
                                  )
        Respondent.      )

## MEMORANDUM OPINION

In 2004, a jury in the Bradley County, Tennessee Criminal Court convicted Drew David Kirkman ("Petitioner") of two counts of first degree murder, two counts of felony murder, and two counts of aggravated robbery.[1] For these offenses, Petitioner received an effective sentence of life plus twenty years. Petitioner now brings this pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging the legality of his confinement under that judgment [Doc. 1].

Warden Gerald McAllister has filed a response to the petition, arguing that relief is not warranted with respect to Petitioner's claims and, in support of his arguments, he has filed copies of the state court record [Doc. 13, Addenda Nos. 1-4]. Petitioner has not replied to the response, and the time for doing so has lapsed.

For the following reasons, this petition will be **DENIED**.

## I.    PROCEDURAL HISTORY

---

[1] The first degree murder and felony murder counts were merged at sentencing. *See State v. Kirkman*, No. E2006-01152-CCA-R3-CD, 2007 WL 2947503, at *1 (Tenn. Crim. App. Oct. 10, 2007), *perm. app. denied* (Tenn. 2008).

On October 10, 2007, Petitioner's convictions were affirmed on direct appeal by the Tennessee Court of Criminal Appeals (hereinafter "TCCA"). *State v. Kirkman*, No. E2006-01152-CCA-R3-CD, 2007 WL 2947503 (Tenn. Crim. App. Oct. 10, 2007), *perm. app. denied* (Tenn. 2008). On April 14, 2008, the Tennessee Supreme Court (hereinafter "TSC") denied Petitioner's application for permission to appeal. *Id.*

Petitioner then challenged his convictions by filing, on October 12, 2004, a petition for post-conviction relief. *Kirkman v. State*, No. E2010–02296–CCA–R3–PC, 2012 WL 1431229 (Tenn. Crim. App. Apr. 25, 2012), *perm. app. denied* (Tenn. 2012). After holding an evidentiary hearing on the claims, the state post-conviction court denied the petition and the TCCA affirmed the denial. *Id.*, 2011 WL 862029, at *1, *5. Petitioner's request for permission to appeal was likewise denied by the TSC.

There followed this timely § 2254 habeas corpus application [Doc. 1].

## II.   FACTUAL BACKGROUND

The following factual recitation is taken from the Tennessee Court of Criminal Appeal's post-conviction opinion summarizing the evidence presented at trial.

> According to a statement given by the [petitioner] to the police, the [petitioner] was involved in a check cashing scheme with several other individuals, including Elka Fallis, Jeff Cross, Daniel Goldston, and Candace Tracy Clayton. The [petitioner] said that on the evening of Monday, January 28, 2002, Fallis became upset, claiming that Goldston and Clayton were attempting to "screw over" the other members of the operation. Fallis then suggested that she, the [petitioner], and Cross go over to the residence Goldston and Clayton shared to "pop" them, meaning shoot them. The three then went over to Goldston and Clayton's residence, where a heated argument occurred between Goldston and Fallis. The [petitioner] claims he calmed down Fallis and Goldston before the argument escalated further.
>
> The next morning, the [petitioner] reported to his parole officer, Nancy Baker, for a general intake. At the motion to suppress

hearing, Baker testified that she gave the [petitioner] a drug test, and he tested positive for cocaine, amphetamines, and THC. Baker testified that at the time of the intake, she told the [petitioner] that she was not going to "violate him" that morning, but that "he better be clean the next month." However, on February 4, after the [petitioner] had been arrested in the instant case, Baker filed a probation violation warrant. Baker also testified that she did not request that the [petitioner] be held without bond on the misdemeanor possession charge.

The [petitioner] told police that he, Fallis, and Cross returned to Goldston and Clayton's residence the evening of Tuesday, January 29. After a brief discussion, Goldston began smoking crack cocaine before handing the crack pipe to the [petitioner]. While the [petitioner] was smoking, Fallis began shooting at Goldston and Clayton. The [petitioner] claimed that he stabbed Goldston once in the back, breaking his knife, and that Cross may have stabbed one of the victims. After the [petitioner] stabbed Goldston, he saw Fallis hit Clayton with a table leg. The [petitioner] also stated that he hit Goldston "quite a few times" with a club. The three then left the residence, with the [petitioner] taking knives and $400 in cash from Goldston's pocket on the way out. After the [petitioner] returned to his apartment, he took several bags containing items taken from the victims' apartment to a dumpster. The [petitioner] also gave someone, whom he did not identify, a typewriter used in the check cashing scheme and a gun. The [petitioner] told this person to "get rid" of the gun in a creek.

The [petitioner] told police that Elvenia Franklin took him to work Tuesday night. At trial, Monte Boring testified that he worked with the [petitioner] that night at Advanced Photographic Solutions. According to Boring, the [petitioner] said that he "took care of that n—r what was causing us trouble." Boring claimed that the [petitioner] then said, "[y]ou'll read about it in the papers," and that the [petitioner] mentioned that he had gotten his knife back, as well as something about a carpet being cleaned. Later, Boring heard news reports about Goldston's murder. In his first statement to police, the [petitioner] denied making these statements to Boring. Rather, the [petitioner], who said he was under the influence of drugs when he reported to work that evening, claimed that he told Boring that he was "f-ed up as two n-s." In his first statement to police, the [petitioner] expressed concern that he was being implicated in the crime by Boring, a known drug addict.

Franklin testified that she took the [petitioner] home from work after his shift ended Wednesday morning. At that point, the [petitioner] gave Franklin a typewriter used in the check cashing

scheme. A short while later, Franklin followed the [petitioner] to Fallis's house, where the [petitioner] gave Franklin a small handgun.

Lieutenant John Dailey with the Cleveland Police [D]epartment testified that he investigated the crime scene. Lieutenant Dailey stated that Clayton had suffered a severe head injury, as well as other injuries to her torso. He also noticed that a coffee table had two legs broken, with one missing and one located next to Clayton's body. Lieutenant Dailey testified that Goldston had suffered visible head injuries, and additional examination revealed stab wounds and gunshot wounds. Goldston also had a knife blade sticking out of his back, with the handle broken off. Throughout the residence, Lieutenant Dailey noted several shoe prints which appeared to be made by a K–Swiss sneaker. He also saw a broken club lying next to Goldston, [which] contained what appeared to be blood and human hair, though the officer did not indicate the color of the hair or to whom it belonged. Tennessee Bureau of Investigation (TBI) Special Agent Bradley Everett later performed tests on the club that indicated the club contained blood from both victims.

Dr. Ronald Toolsie, who conducted the autopsies of both victims, testified at trial that Clayton suffered massive blunt trauma injuries to her face and scalp. In his autopsy report, Dr. Toolsie ruled the death a homicide, with the cause of death being "[m]assive craniocerebral injuries with skull fractures due to multiple injuries to left face, left parietal scalp and left occipital scalp." Dr. Toolsie testified that Goldston suffered six stab wounds to the back and two gunshot wounds, which Dr. Toolsie claimed were consistent with the victim being shot while lying face-down. According to Dr. Toolsie, these wounds were fatal. Goldston also suffered blunt force trauma to the back of the head; according to Dr. Toolsie, "[Goldston] looked like he'd been struck four times with a hard, hard-edged but blunt object that caused the skin of the back of the scalp to split."

Early on the morning of Thursday, January 31, Lieutenant Dailey received a call at home ordering him back to work. According to Lieutenant Dailey, he was told only "that someone had called in with a tip about [the petitioner], and that they had gone over to get him and were bringing him down." Lieutenant Dailey later learned that Boring had called in the tip; however, the record is devoid of any information regarding the contents of the tip, the time at which Boring contacted police, or who took Boring's initial statement. Nobody who talked to Boring testified at trial, and Boring's trial testimony did not include information about his initial tip to police.

4

Lieutenant Dailey testified that he arrived at the police station at 1:30 a.m. and that the [petitioner] was already present when he arrived. Lieutenant Dailey testified that he took a statement from Boring as well as from the [petitioner].

At the suppression hearing, the [petitioner] testified that after arriving at work late Tuesday night, several officers arrived at his workplace and entered his work area. The [petitioner] claimed that he was under the influence of drugs that evening, but he also claimed that he was doing nothing wrong at the time the police confronted him. The [petitioner] claimed the police grabbed him, made him stand up, and then placed his arms behind his back and searched him. According to the [petitioner], the police took his cigarettes and keys, and he had nothing else in his pockets at the time. Then, the [petitioner] claimed the police handcuffed him and led him outside. The [petitioner] asked the police why he was under arrest; according to the [petitioner], one of the officers said "You're not under arrest. You're going to tell us what we want to know." The [petitioner] said that another officer then approached him; this officer did not search the [petitioner], but he showed the [petitioner] a bag of marijuana and stated that the [petitioner] was under arrest for simple possession of marijuana. According to the [petitioner], the police transported [him] to the Cleveland Police Department, where the officers left him shackled and handcuffed to a wooden bench. The [petitioner] claimed he was chained to the bench leaning backward, so that he could not lie down or get comfortable. The [petitioner] claimed he was in that position for at least a couple hours before he spoke with Lieutenant Dailey.

Mike Kelley, a former coworker of the [petitioner's], testified that he was working with the [petitioner] the morning [the petitioner] was taken to the police station. Kelley stated that "eight or nine" officers arrived and took the [petitioner] away. Kelley stated that the [petitioner] did not appear to be under the influence of drugs at the time he left the store. Kelley stated that he did not witness the police search the [petitioner] and did not remember hearing any officer saying anything about the [petitioner] possessing any marijuana.

According to Lieutenant Dailey, he interviewed the [petitioner] in his office at the Cleveland Police Department. The transcript of the interview indicates that it began at 2:33 a.m. and ended at 3:33 a.m. During the interview, the [petitioner] denied involvement in the victims' murder. The [petitioner] named several persons with whom he associated and did drugs, including a woman named Robin Fiveash. Lieutenant Dailey testified that the [petitioner] signed a Miranda waiver before the interview, and that during the

5

interview the [petitioner] did not appear to be under the influence of drugs or alcohol, appeared to understand the questions asked of him, did not say that he did not wish to speak to police, and did not ask to speak to an attorney.

Later in the interview, Lieutenant Dailey asked the [petitioner] about what type of shoes the [petitioner] wore. The [petitioner] responded that he owned a pair of K–Swiss shoes. The officer asked if he could go to the [petitioner's] apartment and take an impression of the shoes. The [petitioner] replied that the officer could do so. According to Lieutenant Dailey, he and the [petitioner] then went to the [petitioner's] apartment, where Lieutenant Dailey located the shoes in a tied garbage bag located next to a garbage can. Lieutenant Dailey then asked the [petitioner] if he could take the shoes; the [petitioner] replied that the officer could take them. Lieutenant Dailey then took the shoes and the other contents of the bag, some of which contained blood, into custody. TBI Agent Everett's tests confirmed that the shoes contained Candace Clayton's blood. However, TBI Special Agent Linda Littlejohn testified that although the [petitioner's] shoes were consistent with prints left at the crime scene, no unique identifying marks could lead her to conclusively state that the [petitioner's] shoes made the prints left at the crime scene.

At 7:00 a.m. on January 31, a search warrant was issued for the [petitioner's] residence. However, Lieutenant Dailey testified that nothing of evidentiary value was obtained from the search conducted pursuant to the warrant.

According to the [petitioner], he was transported from the Cleveland Police Department to the Bradley County Justice Center at 9:30 a.m. on January 31. The [petitioner] said he was held shackled in the "drunk tank" until his hearing before the magistrate at 1:30 that afternoon. The [petitioner] claimed that at the probable cause hearing, he was unable to ask for bond because Shari Tayloe, an Assistant District Attorney, "stood up and said that she was going to try to get a violation on me, that she believed I was on probation." The [petitioner] claimed that after the hearing at which the [petitioner] was charged with possession of marijuana and apparently denied bond, he was held for a while in the Justice Center before being transported back to the Cleveland Police Department. The [petitioner] claimed that he asked for a phone call and asked to speak to a lawyer, but these requests were denied.

At trial, Elvenia Franklin testified that at some point on January 31, the [petitioner] did call her. Franklin said that the [petitioner] asked her to bring the typewriter and gun he had given her to

6

Lieutenant Dailey "so he could prove he wasn't the only one involved." Franklin said that she brought the typewriter to police but that she threw the gun into a creek. Franklin eventually pointed police to the creek where she deposited the gun, and the gun was recovered. TBI Special Agent Don Carman testified that his tests confirmed that the gun, a .22 caliber pistol, was used during the offense.

At some point on the afternoon of January 31, Robin Fiveash, one of the persons mentioned in the [petitioner's] initial statement, was contacted by police. According to Lieutenant Dailey, Fiveash gave a statement "in confidence" to Detective Robert Harbison because "she didn't want Mrs. Fallis to know what she was saying." Fiveash told Detective Harbison that she saw the [petitioner] place several items into a dumpster located at the Superior Cash Mart, located next door to his apartment. After gaining permission from a worker at the market, Dailey and other Cleveland Police officers searched the dumpster, retrieving a coffee table leg that appeared to be from the victims' apartment, several knives, a knife handle that was missing its blade, victim Clayton's pocketbook, Post–It notes addressed to "Drew," and some bloody gloves. TBI Agent Everett testified that his tests confirmed that the victims' blood was on the gloves. Agent Everett testified that a broken knife blade retrieved from the dumpster tested positive for victim Goldston's blood, as did a knife handle retrieved from the dumpster. Agent Everett's report indicated that the table leg retrieved from the dumpster tested positive for Goldston's blood, and although Clayton's blood did not appear on the table leg, Dr. Toolsie testified that the table leg "could very well have" inflicted the bruising patterns discovered on her body.

Following her initial, unrecorded statement to police, Fiveash gave a statement to police the afternoon of January 31. In that statement, Fiveash did not mention the dumpster. Fiveash did not mention the [petitioner] placing items in the dumpster in a formal, recorded statement to police until Friday, February 1, after the police had actually retrieved the items from the dumpster.

At 7:02 p.m. on Thursday, January 31, the [petitioner] gave a second statement to Lieutenant Dailey. According to the officer, the [petitioner] voluntarily signed an admonition and waiver form. Lieutenant Dailey stated that shortly after signing the waiver, the [petitioner] asked to take a break and smoke a cigarette. Lieutenant Dailey granted the [petitioner's] requests, after which the [petitioner's] statement resumed. According to Lieutenant Dailey, the [petitioner] did not appear to be under the influence of drugs and appeared to understand the questions he was asked. The officer

7

also said that the [petitioner] did not state that he wished to speak to an attorney and did not ask to end the discussion. According to Lieutenant Dailey, the only issue the [petitioner] raised with him was that the [petitioner] "felt like that I told him he could make bond and then he didn't get to. And then I advised him, 'I set a bond on it. I can't help what happened once you got in front of the Judge.'" The [petitioner] then gave an account of the events that led to the victims' deaths.

At the suppression hearing, the [petitioner] claimed that he did not sign the admonition and waiver form. When shown the admonition and waiver form, the [petitioner] claimed that the signature that appeared on the "signature" line did not match his signature. The [petitioner] claimed that he asked for a lawyer before making the second statement, but defense counsel ultimately admitted that no mention of the [petitioner] asking for a lawyer actually appears in the transcript of the interview. The [petitioner] also claimed that the police knew about his history of mental illness and treatment for that illness. At the preliminary hearing, Lieutenant Dailey admitted that the [petitioner's] criminal history was run "an hour or so after the first interview," and upon seeing the [petitioner's] criminal history, he discovered that the [petitioner] had been found not guilty in a previous homicide case by reason of insanity.

*Kirkman v. State,* No. E2010-02296-CCA-R3-PC, 2012 WL 1431226, at *1-6 (Tenn. Crim. App.

Apr. 25, 2012), *perm. app. denied* (Tenn. 2012).

## III. DISCUSSION

The petitioner lists eleven numbered grounds for relief and two unnumbered grounds, the

latter of which involve defects in Petitioner's state post-conviction proceedings [Doc. 1, pp. 8-9,

16].[2]

> I. Petitioner was denied a full and fair hearing by the state trial court's failure to suppress evidence and statements of the petitioner acquired by the government by virtue of an illegal arrest, seizure and . . . detention and interrogation which resulted from a warrantless arrest without probable cause or articulable suspicion.

---

[2] Petitioner used Roman numerals in listing the eleven grounds and, for consistency's sake, the Court will follow suit and will refer to the last two unnumbered grounds as Grounds XII and XIII.

8

II.  Petitioner was denied a full and fair hearing by the state trial court's failure to grant a mistrial when the prosecuting district attorney improperly argued to the jury facts not in evidence nor supported by any competent testimony from law testimony or expert testimony.

III.  The trial court improperly sentenced the petitioner to consecutive sentences on his murder conviction for first degree murder and felony conspiracy to commit murder and aggravated robbery when all crimes were committed in the same transaction in temporale occurrence.

IV.  Petitioner' unconstitutional arrest and interrogation (as found to exist by the state court of criminal appeals) should prevent the introduction of all evidence flowing from said constitutional violations from being introduced against the petitioner.

V.  Under the facts in this case, the conduct found to be illegal and purposefully and flagrantly accomplished by the police cannot be subsequently cured, attenuated or rendered harmless by the mere fact that the petitioner was taken before a magistrate on a misdemeanor charge (which he was ultimately never indicted for) and withheld from bond because of the possibility of other charges being brought.

VI.  The state courts' conclusion that information flowing from individuals who the police became aware by virtue of their illegal, flagrant and improper conduct cannot be said to be harmless.

VII.  The cumulative effect of numerous blatant, flagrant and simple error [sic] was erroneously ignored and considered harmless error by the state courts.

VIII.  The state courts failed to consider that the additional evidence discovered between the petitioner's blatantly unconstitutional interrogation leading to his first statement directly resulted in the acquiring of additional evidence from persons unknown to the police but for the first unconstitutional retaken statement was considered a basis for allowing a subsequent confession and it should have been considered an extension or continuation of the unconstitutional arrest, seizure and questioning.

IX.  The state courts failed to consider that plain error which would traditionally be considered harmless should be taken to light with constitutional proportion errors so that the cumulative effect of all errors requires relief to the petitioner.

X.     The state courts erred in denying petitioner's petition for post-conviction relief due to ineffective assistance of counsel.

XI.    Petitioner was denied effective assistance of counsel due to trial counsel's failure to adequately prepare and present a defense based upon petitioner's mental condition at the time the crimes were committed, and he was denied effective assistance of counsel at trial and on appeal.

XII.   Petitioner was denied a full and fair hearing regarding all his claims for relief in this matter, especially with regard to his claims for relief as contained in his state petition for post-conviction relief.

XIII.  The state trial court failed to properly render findings of fact and conclusions of law with regard to each ground raised in petitioner's post-conviction petition.

The Warden argues, in his answer, that all grounds for relief, save two, are not cognizable habeas corpus claims; are barred by state procedural defaults; or are conclusory. The Warden further argues that the two excepted grounds, namely Grounds X and XI, were adjudicated by the state courts resulting in decisions which must remain undisturbed, under the deferential review standards set forth in 28 U.S.C. § 2254, because those decisions are neither contrary to or an unreasonable application of well-established Supreme Court precedent, nor an unreasonable determination of the facts presented to the state court.

The Court agrees with Respondent Warden concerning Petitioner's entitlement to habeas corpus relief and, for the reasons which follow, will **DENY** the petition and **DISMISS** this case.

The claims have been organized into different categories for purposes of discussion – non-cognizable claims, procedurally defaulted claims, and adjudicated claims.

A.     **Non-Cognizable Claims**

1.   **Consecutive Sentencing (Ground III)**

Petitioner maintains that he was improperly sentenced to consecutive terms of

10

imprisonment, though all his crimes were committed in the same transaction and at the same time.

Petitioner's assertion that state sentencing law was misinterpreted or misapplied concerns purely an issue of state law. An allegation that a sentence has been imposed in violation of state sentencing law does not present a constitutional issue. *See e.g., Sneed v. Donahue*, 993 F.2d 1239, 1244 (6th Cir. 1993) (assertion that sentences were aggregated under state law causing an illegal total sentence is not a cognizable habeas corpus claim); *Howard v. White*, 76 Fed. App'x. 52, 53 (6th Cir. 2003) ("A state court's alleged misinterpretation of state sentencing guidelines and crediting statutes is a matter of state concern only.").

Because this claim does not allege a violation of federal constitutional law, it provides no cognizable basis for habeas corpus relief. 28 U.S.C. § 2254(a) (habeas corpus relief is appropriate only for constitutional violations); *see Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (claims which allege a state law error or an incorrect application of state law do not present cognizable issues for federal habeas review); *Pulley v. Harris,* 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law.").

Based on the finding that Ground Three is not a cognizable claim in these habeas proceedings, the Court need not address Respondent's alternative argument that the claim also has been procedurally defaulted.

### 2. Search & Seizure Issues (Grounds IV, V, VI & VIII)

Broadly construing Petitioner's allegations in Grounds, IV, V, VI and VIII, the Court understands him to be asserting that he was arrested without a warrant, which the TCCA held to have been a Fourth Amendment violation, and that the TCCA committed an error by failing to suppress his subsequent statements and all other evidence obtained as a result of the illegal

11

arrest.

While pointing out that these claims are supported by no allegations of fact and, thus, are insufficiently pled, Respondent has interpreted Petitioner's allegations as encompassing the Fourth Amendment challenges he asserted in his direct appeal brief.

Respondent argues that the claims, as interpreted, are not cognizable in a federal habeas corpus proceeding, pursuant to the doctrine the Supreme Court announced in *Stone v. Powell*, 428 U.S. 465 (1976). *Stone* held that "where the [s]tate has provided an opportunity for a full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494.

Petitioner raised his Fourth Amendment claims in the trial court, which held a suppression hearing, and later ruled against him. Dissatisfied with the results of the hearing, Petitioner offered the claims to the TCCA on direct review and obtained another unfavorable decision. The challenged evidence, so held the TCCA, was either properly admitted or its admission was harmless error. The TCCA did not grant relief. Petitioner now asserts, in Ground One, that he was denied a full and fair hearing in which to litigate his Fourth Amendment claims.

In this circuit, to determine whether a Petitioner had a "full and fair" opportunity to litigate his Fourth Amendment claims, a two-part test is applied. *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982). First, a court "must determine whether the state procedural mechanism, in the abstract, presents the opportunity to raise a fourth amendment claim[,]" and second, it must determine "whether presentation of the claim was in fact frustrated because of a failure of that mechanism." *Id. Stone*'s requirement of an "'opportunity for full and fair consideration' means an available avenue for the prisoner to present his claim to the state courts, not an inquiry into

the adequacy of the procedure actually used to resolve that particular claim." *Good v. Berghuis*, 729 F.3d 636, 639 (6th Cir. 2013). Nor does *Stone* support an inquiry into the correctness of the state court's decision. *Riley*, 674 F.2d at 526 (citing *Stone,* 428 U.S. at 493 n.35).

Indeed, where a petitioner has presented a "suppression motion to the state trial court, and the trial court rejected it" and he presses the issue on direct review, and again it is rejected, "that suffices to preclude review of the claim through a habeas corpus petition under *Stone v. Powell*." *Id.* at 640. That is just what happened here. Therefore the *Stone* rule applies to Petitioner's claims and those claims are not reviewable. *See Seymour v. Walker*, 224 F.3d 542, 553 (6th Cir. 2000).

### 3. Cumulative Error (Grounds VII & IX)

Petitioner maintains, in Grounds VII and IX, that the state courts did not consider the cumulative effect of errors which, taken together, were not harmless and, thus, entitle Petitioner to relief.

First of all, as Respondent correctly maintains, Petitioner has not described the errors that allegedly occurred and that he believes should have been added together to justify relief. Thus, Petitioner's presentation of this claim does not comply with the habeas rules. Rule 2(c) of the Section 2254 Rules provides, in pertinent part, that the petition must "(1) specify all the grounds for relief available to the petitioner; [and] state the fact supporting each ground." Notice pleading is not permitted in habeas petitions. *Blackledge v. Allison*, 431 U.S. 63, 75-76, n.7 (1977). And, the Court observes that a constitutional claim which is not clothed with facts is conclusory and does not merit relief. *Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991).

Finally, "the law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." *Williams v. Anderson,* 460

13

F.3d 789, 816 (6th Cir. 2006) (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) (observing that "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief").

Based on the finding that Grounds VII and IX are insufficiently pled and also non-cognizable, the Court will not address Respondent's alternative argument that the claims have been procedurally defaulted.

### 4. Flawed Post-Conviction Procedures (Grounds XII & XIII)

Petitioner contends that he was denied a full and fair hearing on his post-conviction claims and that, moreover, the trial court failed to make appropriate findings of fact and conclusions of law with respect to all post-conviction claims he presented.

The Sixth Circuit has recognized that there is no federal constitutional requirement that states provide a means of post-conviction review of state convictions and has held that alleged infirmities in state post-conviction proceedings are not cognizable on federal habeas review. *See Roe v. Baker*, 316 F.3d 557 (6th Cir. 2002); *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986) (noting that "[c]laims attacking a state court's application of post-conviction procedures do not state a basis for a federal claim under 28 U.S.C. § 2254"). Additionally, whether a state court opinion contains findings of fact and conclusions of law is not a matter on which this habeas Court may sit in judgment. *Harrington v. Richter*, 562 U.S. 86, 99 (2011) ("Opinion-writing practices in state courts are influenced by considerations other than avoiding scrutiny by collateral attack in federal court.").

Because the Court has concluded that Grounds XII and XIII are not cognizable federal claims, the Court will not address Respondent's alternative arguments that the claims lack merit, that they have been procedurally, or that they have been adjudicated and may not be disturbed

under § 2254(d).

## B. Procedurally Defaulted Claims

Respondent Warden maintains that Grounds I and II have been procedurally defaulted and, thus, are now barred from habeas corpus review.

A state prisoner must exhaust all constitutional claims by fully and fairly presenting them in state court before a federal court can consider them in a habeas proceeding. 28 U.S.C. § 2254(b)(1)(A), (C). A petitioner commits a procedural default by failing to raise a federal claim first in a state court, which bars habeas corpus relief unless that petitioner can show cause to excuse his default and prejudice as a result of the alleged constitutional violation. *See Coleman v. Thompson,* 501 U.S. 722, 752-53 (1991).

There are several types of procedural default. A petitioner who has never presented a claim in the state courts and who is barred from returning to those courts to present his claim has committed a procedural default. *Id.* at 732. A procedural default also occurs when a federal claim is offered not on a federal constitutional basis, but instead as one arising only under state law. *Stanford v. Parker*, 266 F.3d 442, 451 (6th Cir. 2001).

Cause can be shown by the existence of "some objective factor external to the defense" such as interference by government officials, where the factual or legal basis for a claim was not reasonably available, or ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A petitioner demonstrates prejudice by establishing that the constitutional error "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). Absent cause and prejudice, a petitioner who shows that he is actually innocent can overcome the procedural hurdle as well. *Murray*, 477 U.S. at 496.

### 1. Denial of a Full and Fair Hearing (Ground I)

Petitioner claims that he was denied a full and fair hearing on the suppression of evidence and statements obtained as a result of a warrantless illegal arrest, seizure, detention, and interrogation. To the extent that Petitioner is attempting to raise an independent claim,[3] as Respondent points out, Petitioner never offered the state courts the opportunity to pass on his assertions in Ground I that he was denied a full and fair hearing on his Fourth Amendment claims. Petitioner has presented nothing to show cause and prejudice, and this failure results in an unexcused procedural default.

Given the Court's finding of procedural default, the alternative bases asserted by Respondent to support dismissal of this claim will not be addressed.

### 2. Denial of a Mistrial (Ground II)

Petitioner claims that he was denied a full and fair hearing by the state court's refusal to grant a mistrial as a result of improper argument by the state, which was based on facts not in evidence and was not supported by competent testimony by experts. Respondent suggests that, while the claim is insufficiently alleged, if it is liberally construed as being the same claim Petitioner presented on appeal regarding the trial court's failure to declare a mistrial when the prosecutor engaged in improper closing argument, then the claim has been procedurally defaulted.

As Respondent correctly asserts, the state courts were presented with the allegations in Ground II that a mistrial should have been declared based on the prosecutor's closing argument. However, this claim was only presented as a violation of state law, not as a violation of federal

---

[3] Because Ground I was also construed as an argument which was intertwined with Grounds IV, V, VI, and VIII, alleging Fourth Amendment violations, the argument was addressed in that context as well.

law.

To avoid a finding of procedural default, a claim must be offered to the state courts on a federal constitutional basis—not merely as one arising under state law. *Stanford*, 266 F.3d at 451 *Riggins v. McMackin*, 935 F.2d 790, 792-93 (6th Cir. 1991). Petitioner's claim was constructed on a state law footing.

There are no remaining state court remedies available to Petitioner, due to the post-conviction statute of limitations, as well as the state's one-petition rule, *see* Tenn. Code Ann. § 40-30-102(a) and (c), and the alleged error in failing to grant a mistrial can no longer be raised as a constitutional violation in the state courts. *Coleman*, 501 U.S. at 732. Federal review of a procedurally defaulted claim is foreclosed, unless the habeas petitioner can show cause to excuse his failure to comply with the state procedural rule and actual prejudice resulting from the alleged constitutional violation. *Id.*

Petitioner offers nothing by way of cause or prejudice, and his unexcused procedural default precludes federal habeas corpus review of Ground II.

## C.     Adjudicated Claims

Petitioner asserts, in the remaining grounds, that the state courts erred in denying claims of ineffective assistance of counsel, including  that counsel failed to present an insanity defense on his behalf at trial.

### 1.  Standard of Review

Adjudicated claims, such as those raised in Grounds X and XI, are evaluated under the review standards contained in the Antiterrorism and Effective Death Penalty Act (AEDPA), codified in 28 U.S.C. § 2241, which instruct a court considering a habeas claim to defer to any decision by a state court concerning the claim unless the state court's judgment (1) "resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

A state court's decision is "contrary to" federal law when it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or resolves a case differently on a set of facts which cannot be distinguished materially from those upon which the precedent was decided. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Under the "unreasonable application" prong of § 2254(d)(1), the relevant inquiry is whether the state court decision identifies the legal rule in Supreme Court cases which governs the issue but unreasonably applies the principle to the particular facts of the case. *Id.* at 407. The habeas court is to determine only whether the state court's decision is objectively reasonable, not whether, in the habeas court's view, it is incorrect or wrong. *Id.* at 411; *see Harrington*, 562 U.S. at 102 (noting that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.").

The AEDPA standard is a high standard to satisfy. *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (noting that "§ 2254(d), as amended by AEDPA, is a purposefully demanding standard . . . 'because it was meant to be'") (quoting *Harrington*, 562 U.S. at 102). AEDPA prevents the use of "federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). Further, findings of fact which are sustained by the record are entitled to a presumption of correctness—a presumption which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Supreme Court has pointedly observed, "AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the

reasonable decisions of state courts." *Id.* at 781.

## 2. Governing Legal Rules on Ineffective Assistance of Counsel Claims

The Sixth Amendment provides, in pertinent part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. A defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a break down in the adversary process that renders the result unreliable.

*Id*.

In considering the first prong of the test set forth in *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Id*. at 688. A petitioner asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id*. at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Thus, it is strongly presumed that counsel's conduct was within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

19

When considering *Strickland*'s second prong, a petitioner must show a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "That requires a substantial, not just conceivable, likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (citation and internal quotation marks omitted).

Counsel is constitutionally ineffective only if a performance below professional standards caused the defendant to lose what he "otherwise would probably have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992). Yet, the core inquiry remains "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

Finally, a petitioner asserting claims of "ineffective assistance of counsel under *Strickland* have a heavy burden of proof." *Whiting v. Burt*, 395 F.3d 602, 617 (6th Cir. 2005). "[W]hen a federal court reviews an ineffective-assistance claim brought by a state prisoner, the question is not simply whether counsel's actions were reasonable, 'but whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *McGowan v. Burt*, 788 F.3d 510, 515 (6th Cir. 2015) (quoting *Harrington*, 562 U.S. at 105). Moreover, because AEDPA applies, this Court's evaluation of the TCCA's decision on the ineffective assistance claims is "'doubly deferential' . . . that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (quoting *Cullen*, 563 U.S. at 190).

### 3. Claims of Ineffective Assistance of Counsel

The first two grounds or parts thereof in this "Adjudicated Claims" category are

addressed together since the same analysis applies to both claims.

        **a.**     **Denial of Relief on Ineffective Assistance Claims [Ground X];**
        **b.**     **Denial of Effective Assistance at Trial and on Appeal [Ground XI, Part Two]**

In Ground X, Petitioner maintains that the state courts erred in denying his petition for post-conviction relief, based on his claims of ineffective assistance. Petitioner asserts, in the second part of Ground XI, that he was denied effective assistance of counsel at trial and on appeal. Petitioner has supplied no details regarding the errors on the part of the state courts; no description of the claims which were denied; no allegations as to any specific acts or omissions on the part of either trial or appellate counsel; and no assertions as to any prejudice ensuing from counsel's conduct.

As noted, it is up to a petitioner seeking habeas corpus relief to specify his grounds and to state the facts supporting each ground thus specified. Rule 2(c), Rules Governing Section 2254. Petitioner has omitted any of the facts to support his claims, and his respective failings render the claims insufficient.

Furthermore, to obtain relief under *Strickland*, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. If a petitioner fails in this regard, a court considering the claim of ineffective assistance cannot determine "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* And to prevail under AEDPA, Petitioner "must show that the Tennessee Court of Appeals applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 699 (2002).

Accordingly, without contentions showing a deficient performance and prejudice on the

part of counsel and "that the Tennessee Court of Appeals applied *Strickland* to the facts of his case in an objectively unreasonable manner," *Bell v. Cone*, 535 U.S. 685, 699 (2002), Grounds X & XI [Part two] warrant no relief.

Because the Court finds that these grounds are insufficiently pled and that they fail to show a basis for AEDPA relief based on a Sixth Amendment violation of the right to ineffective assistance, the Court will not address Respondent's argument that Petitioner has procedurally defaulted the claim(s) that his appellate counsel gave him ineffective assistance.

### c. Failure to Mount a Mental Defense [Ground XI, Part One]

Petitioner alleges that counsel failed to prepare and present a defense based on Petitioner's mental condition at the time the crimes were committed.

Petitioner raised this claim in his post-conviction appeal. The TCCA pointed to the trial court's determination that there was proof that an evaluation performed on Petitioner by the Hiwassee Mental Health Center resulted in a finding that an insanity defense could not be supported. The TCCA likewise indicated that the trial court had found that trial counsel retained Dr. Diana McCoy for a further mental examination of Petitioner, but that she concurred with the earlier opinion of the Hiwassee Mental Health Center and that she did not believe that an insanity defense could be supported. The trial court had gone on to state that "[t]rial counsel testified that, because of these reports, he did not think that an insanity defense would work in this case and further thought that the risk he would run in trying to use such a defense was not worth the risk in giving up the other available defenses." *Kirkman v. State*, 2012 WL 1431229, at *12.

After summarizing the trial court's findings, the TCCA commented that trial counsel clearly was aware of Petitioner's prior history of being found not guilty by reason of insanity and that he had testified that he had considered an insanity defense as a possible alternative defense;

had researched the defense; had obtained mental evaluation; and had hired a qualified psychologists to perform another evaluation on Petitioner. The TCCA likewise noted that Dr. McCoy, when she performed the evaluation, was aware of Petitioner's prior history and had spoken with Dr. Heide,[4] but that she had doubts about Petitioner's credibility regarding certain facts and discovered nothing helpful to support this mental defense.

Dr. Heide acknowledged that she had no opinion as to Petitioner's mental state at the time the murders were committed; that her interviews and evaluations in his case occurred after his convictions; that she was given no records in the case; and that her conclusions were strictly based upon information received directly from Petitioner. Though Dr. Heide believed that her information regarding Petitioner's history of abuse could have affected the jury's verdict with regard to the provocation issue, the TCCA determined that even if, in retrospect, she was correct as to the effect the information might have had on the jury's verdict, that would not suffice to establish either a deficient performance or prejudice. Ultimately concluding that trial counsel made a strategic decision, after adequate preparation, not to use Dr. Heide as an expert, the TCCA denied relief on the claim.

The TCCA prefaced its analysis of this ineffective assistance claim by citing to *Strickland* for the components of an ineffective assistance claim. Therefore, the TCCA's decision was not contrary to the relevant well-established rule in a Supreme Court case. *See Cullen*, 563 U.S. at 189 (observing upon review of an ineffective assistance claim that "[t]here is no dispute that the clearly established federal law here is *Strickland v. Washington*").

This Court's evaluation of the TCCA's decision on the deficient-performance aspect of

---

[4] Dr. Kathleen Heide, a professor and a licensed mental health counselor, who specialized in dealing with juveniles who had killed their parents, assisted in Petitioner's earlier defense in Florida, where he had been found not guilty by reason of insanity in the murder of his father, and wrote a book about Petitioner. *Kirkman*, 2012 WL 1431229, at *7-8.

ineffective-assistance claims is "'doubly deferential' [a standard] . . . that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (quoting *Cullen*, 563 U.S. at 190). The TCCA detailed all the investigation that had preceded counsel's decision not to assert an insanity defense, including securing two mental evaluations for his client. None of the experts who performed those evaluations discovered anything to support such a defense. Indeed, Dr. Heide testified that she had no opinion as to Petitioner's mental state at the time of the murders.

As *Strickland* instructs, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight" and that [s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 689, 690. Deference is owed to an attorney's strategic decisions, of which Petitioner's counsel's choice not to assert an insanity defense for which there is no support was one. *Knowles*, 556 U.S. at 123 (observing that there is no requirement for "defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success"). And, though the TCCA did not directly so state, it is clear that that there was no prejudice since nothing appears in the record to show that there was a reasonable probability that a mental defense would have succeeded.

The TCCA's adjudication of this claim was entirely reasonable under *Strickland*'s guidelines. The writ will not issue with respect to this claim.

## IV.    CONCLUSION

For the above reasons, this pro se state prisoner's application for a writ of habeas corpus will be **DENIED** and this case will be **DISMISSED**.

## V. CERTIFICATE OF APPEALABILITY

Finally, the Court must consider whether to issue a certificate of appealability (COA) should Petitioner file a notice of appeal. A petitioner may appeal a final order in a § 2254 case only if he is issued a COA, and a COA will be issued only where the applicant has made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c). A petitioner whose claims have been rejected on a procedural basis must demonstrate that reasonable jurists would debate the correctness of the Court's procedural ruling. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Porterfield v. Bell*, 258 F.3d 484, 485-86 (6th Cir. 2001). Where claims have been dismissed on their merits, a petitioner must show reasonable jurists would find the assessment of the constitutional claims debatable or wrong. *See Slack*, 529 U.S. at 484.

After having reviewed each claim individually and in view of the firm procedural basis upon which is based the dismissal of most claims and the law upon which is based the dismissal on the merits of a few of the claims, reasonable jurors would neither debate the correctness of the Court's procedural rulings nor its assessment of the claims. *Id.* Because reasonable jurists could not disagree with the resolution of these claims and could not conclude that they "are adequate to deserve encouragement proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003), the Court will **DENY** issuance of a COA. 28 U.S.C. § 2253; Fed. R. App. P. 22(b).

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER**.


_____*/s/ Harry S. Mattice, Jr.*_____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE